HULL, Circuit Judge:
A group of airline pilots allege that the Air Line Pilots Association — a labor union — libeled them by placing them on a “scabs” list. The pilots also assert that by listing them as “scabs,” the union intentionally interfered with their business relationships with other airlines. The district court dismissed the tortious interference claim for failure to state a claim for relief. As for the libel claim, the court held on summary judgment that the description of the pilots as “scabs” was not false because the pilots admit they crossed union picket lines and worked during the 1989 strike of Eastern Air Lines. The district court also held there was no evidence of actual malice. We affirm.
*1189 I. FACTS

A.Eastern Pilots’ Sympathy Strike

The Air Line Pilots Association (“ALPA”) is a labor union that represents airline pilots from a number of commercial airlines. Within each airline, ALPA operates through a Master Executive Council (“MEC”), a board of elected pilot representatives that makes union policy decisions relating to that airline.
In early 1989, Eastern Air Lines, Inc. (“Eastern” or “EAL”) reached an impasse in its negotiations with the International Association of Machinists (“IAM”), and IAM began to consider a strike. At its February 1989 meeting, the Eastern MEC adopted a formal resolution declaring the MEC’s intention to direct phots to honor IAM picket lines in the event of an IAM strike.
The Eastern MEC also directed its officers to survey the membership to measure pilot support for a sympathy strike to provide guidance to the MEC’s strike deliberation. On February 16, 1989, MEC Chairman Bavis sent a letter to each Eastern phot enclosing a copy of the MEC resolution expressing support for the IAM. The following day, the Eastern MEC sent a “ballot poh card” to each Eastern phot. Nearly seventy-five percent of the 2,165 phots who returned the bahot poh cards responded that they would honor IAM picket lines outright or would support the MEC’s decision to call a sympathy strike.
The Eastern MEC met again on March 1, 1989. After reviewing the results of the phot survey and conducting a last-minute telephone poh revealing even stronger pilot support, the MEC unanimously adopted a resolution “that all Eastern Air Lines phots shall honor the International Association of Machinists picket lines and shall refuse to cross picket lines and that all phots shall refrain from performing any work for EAL during the strike.”
On March 4, 1989, the IAM struck Eastern, and ALPA commenced its sympathy strike. Over ninety percent of the approximately 3,400 Eastern pilots initially joined the sympathy strike and refused to cross IAM picket lines.

B. “Scabs” List

Eastern encouraged phots to cross picket lines by promising that any phot who returned to work would receive promotions to higher-paying positions. In response, on March 28, 1989, the Eastern MEC unanimously adopted a formal resolution to “publish a finalized list of strikebreaking pilots at the conclusion of the ALPA sympathy strike” and to bring internal union charges under ALPA’s constitution against ALPA members who crossed the picket lines. Individuals were placed on this list of working pilots only upon receipt of two confirmed reports that they had crossed ALPA picket lines, and after being provided with “an opportunity to refute the allegation” that they had crossed picket lines to fly for Eastern.
The Eastern MEC, the strike operations committee, and striking phots repeatedly advised working phots that the union would regard them as “scabs” if they crossed ALPA’s picket lines. For example, a July 31 MEC strike committee report reminded pilots that, “[a] pilot becomes [a] scab at [the] moment he signs to go back to work.”

C. Pilots Vote to Continue Strike

Meanwhile, the Eastern MEC was engaged in an internal debate about whether to continue the Eastern pilots’ sympathy strike. Initially, the MEC convened on August 1, 1989, and met for five consecutive days to review the situation. Following substantial discussion, two “straw” polls of the MEC members established that a majority favored continuation of the sympathy strike; thus, the MEC unanimously adopted a resolution to continue the sympathy strike pending membership meetings at each local pilot base.
The first of these local pilot meetings was held on August 6 in Miami and broadcast to other cities. As detailed later, the parties dispute what the ALPA and East *1190 ern MEC leadership said at this August 6 meeting about returning to work. However, it is undisputed that the August 6 meeting concluded with the Miami-based Eastern pilots voting overwhelmingly, by a show of hands, to continue the sympathy strike. Subsequent local pilot meetings yielded the same result. From August 6 to 9, ALPA held pilot meetings at communication centers throughout the Eastern system. At each meeting, with one exception, the phots voted overwhelmingly to continue the sympathy strike.
On August 11, 1989, the Eastern MEC made an official decision to continue the sympathy strike. ALPA President Duffy notified all ALPA pilots of the MEC’s decision by letter, explaining: “Over the past week ... the Eastern pilots have reviewed their options and have voted overwhelmingly not to return to work without a structured ' settlement of the sympathy strike.” On August 12, 1989, the strike operations committee likewise confirmed that “THE STRIKE IS ON!! THE PICKET LINE REMAINS!!” The pilots’ overwhelming vote to remain on strike was widely reported in the media and in internal ALPA communications.
On November 22, 1989, the Eastern MEC voted to end the pilots’ sympathy strike, despite the fact that the IAM strike had not ended. Accordingly, the MEC made an unconditional offer' — on behalf of all pilots — to return to work.
During the sympathy strike, ALPA had compiled a “scabs” list of pilots who crossed union picket lines to fly for Eastern. ALPA added the names of other crossover pilots and new hires over time. The list was available to anyone who wanted it. In 1991, ALPA produced and distributed 50,000 copies of the “scabs” list. This final publication was entitled “The Scabs of Eastern of the Strike of ’89.”
The Plaintiffs-Appellants in this case are all pilots who were on this list. They brought suit against ALPA,[1] alleging, inter alia, that the publication of the “scabs” list constituted libel and that it intentionally interfered with their business relationships with other airlines.[2] The district court dismissed the tortious interference allegation for failure to state a claim under Florida tort law.[3] The court granted summary judgment to ALPA on the libel claim, concluding that the pilots had not shown the “scabs” list was false or evidence of actual malice, as required for a libel claim.[4] The phots now appeal these rulings.
II. STANDARD OF REVIEW
This Court reviews de novo the dismissal of a complaint for failure to state a claim, construing all allegations in the complaint as true and in the light most favorable to the plaintiff. Lowell v. American Cyanamid Co., 177 F.3d 1228, 1229 (11th Cir.1999); Harper v. Thomas, 988 F.2d 101, 103 (11th Cir.1993). A complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle plaintiff to relief. Hall v. Coram Healthcare Corp., 157 F.3d 1286, 1288 (11th Cir.1998); Terry v. Cook, 866 F.2d 373, 375 (11th Cir.1989).
Our review of a summary judgment order is also de novo. See Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. *1191 451, 465 n. 10, 112 S.Ct. 2072, 2081 n. 10, 119 L.Ed.2d 265 (1992); Harris v. H & W Contracting Co., 102 F.3d 516, 518 (11th Cir.1996); Carriers Container Council v. Mobile S.S. Assoc., Inc., 896 F.2d 1330, 1337 (11th Cir.1990). We review all evidence and all factual inferences therefrom in the light most favorable to the non-moving party.
III. TORTIOUS INTERFERENCE CLAIM
We first consider the pilots’ claim for tortious interference with business relationships. ALPA moved to dismiss the claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted; the district court granted the motion. See Dunn v. Air Line Pilots Ass’n, 836 F.Supp. 1574, 1584 (S.D.Fla.1993). The pilots challenge this dismissal.[5]
Under Florida law, the elements of an interference with a business relationship claim are: (1) the existence of a business relationship, (2) the defendant’s knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship. See Tamiami Trail Tours, Inc. v. Cotton, 432 So.2d 148, 151 (Fla. 1st DCA 1983), aff'd in relevant part, 463 So.2d 1126, 1127 (Fla.1985). A “business relationship,” for purposes of the first prong, does not require the existence of a contractual agreement. See id. It does, however, require a relationship with a particular party, and not just a relationship with the general business community. See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 815 (Fla.1994). In their complaint, none of the pilots alleged the existence of a business relationship with a particular airline. They instead alleged that ALPA’s publication of the scab list prohibited them from obtaining employment with any commercial airline-in other words, that it interfered with the pilots’ ability to sell their labor to the general community. Such an allegation is insufficient to state a claim for intentional interference with a business relationship; we therefore affirm the district court’s dismissal of this claim.
IV. LIBEL CLAIM
Turning to the pilots’ libel claim, we initially discuss applicable Supreme Court precedent and why the “scabs” list was not false. We next explain why the district court correctly held that the 1989 strike was lawfully called and why ALPA’s interpretation of its governing rules is entitled to judicial deference. Finally, we address the lack of evidence of actual malice.

A. Supreme Court Precedent

Under Florida law, libel is defined as the unprivileged written publication of false statements that cause injury. See Delacruz v. Peninsula State Bank, 221 So.2d 772, 775 (Fla. 2d DCA 1969). However, the Supreme Court has instructed that federal labor law partially preempts state libel law because national labor policy favors free speech, open communication, and robust debate in labor disputes. Old Dominion Branch No. 496, Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 273, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); Linn v. United Plant Guard Workers Local 114, 383 U.S. 53, 57-58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Therefore, when published in the context of a labor dispute, a *1192 defamatory statement concerning a plaintiff is actionable only if a plaintiff shows the statement was made with actual malice. Linn, 383 U.S. at 65, 86 S.Ct. 657 (applying malice requirement to statements made during union organizing campaign); Letter Carriers, 418 U.S. at 273-81, 94 S.Ct. 2770 (interpreting Linn to apply to all labor disputes).
To show “actual malice” a plaintiff must establish by clear and convincing evidence that the speaker made the statement “ ‘with knowledge that it was false or with reckless disregard of whether it was false or not.’ ” Letter Carriers, 418 U.S. at 281, 94 S.Ct. 2770 (quoting test adopted by analogy from New York Times v. Sullivan, 376 U.S. 254, 280, 285-86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (setting out standard for First Amendment restrictions on state defamation law and stating that plaintiff bears the burden of proving actual malice with “convincing clarity”)); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (clarifying that New York Times requires “clear and convincing proof’ of actual malice). In addition, “[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact.” Letter Carriers, 418 U.S. at 284, 94 S.Ct. 2770. Thus, a defamation claim escapes labor-law preemption only if (1) there is a false statement of fact; and (2) the plaintiff proves actual malice by clear and convincing evidence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining how New York Times’s requirement of clear and convincing proof affects the court’s inquiry and presents a formidable obstacle at summary judgment).
The Supreme Court has emphasized that the epithet “scab” is “commonplace” in labor disputes and is a factual allegation that will support a libel claim but only if false and made with actual malice. Linn, 383 U.S. at 60-61, 86 S.Ct. 657; Letter Carriers, 418 U.S. at 282, 94 S.Ct. 2770. Indeed, the Supreme Court’s Letter Carriers decision involved a “scab” defamation suit where the Court explained that “the only factual statement in the disputed publication is the claim that appellees were scabs.” Letter Carriers, 418 U.S. at 285, 94 S.Ct. 2770. The Supreme Court examined the context in which “scabs” was used and held that naming the appellees as “scabs” was factually true and therefore appellees’ claims failed, stating:
Rather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true. One of the generally accepted definitions of “scab” is “one who refuses to join a union,” Webster’s Third New International Dictionary (unabridged ed.1961), and it is undisputed that the appellees had in fact refused to join the Branch.
Id. at 282-83, 86 S.Ct. 862. In Letter Carriers, there was not even a union organizing campaign, much less an ongoing strike or work stoppage. Yet, the Supreme Court held that the description “scabs” was not false even where used in the context, of a union’s simply gathering supporters.[6]
*1193 In Letter Carriers, the Supreme Court further explained that falsity in a libel case must be examined from the perspective or understanding of the reader. The Supreme Court followed the reasonable reader approach developed earlier in Greenbelt Cooperative Publishing Association v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In Bresler, the defendants had characterized the position of the plaintiff in certain negotiations as “blackmail,” and at trial, the plaintiff had recovered damages for libel on the theory that defendants knew he had committed no such criminal offense. The Supreme Court reversed, holding that this use of the word “blackmail” should not be legalistically construed as the commission of the criminal offense of “blackmail” but the way a reader would have reasonably perceived the word. In Letter Carriers, the Supreme Court quoted Justice Stewart’s reasoning in Bresler:
It is simply impossible to believe that a reader who reached the word “blackmail” in either article would not have understood exactly what was meant: it was Bresler’s public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bres-ler with the commission of a criminal offense.
Letter Carriers, 418 U.S. at 285-86, 94 S.Ct. 2770 (quoting Bresler, 398 U.S. at 14, 90 S.Ct. 1537). Applying this reasoning in Letter Carriers, the Supreme Court found a reasonable reader of the union’s use of the term “traitor” would not understand the union “to be charging the appellees with committing the criminal offense of treason.” 418 U.S. at 285, 94 S.Ct. 2770.
The reasonable reader approach has been followed consistently by the Supreme Court and this Circuit. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 515, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (inquiring into “the meaning a statement conveys to the reasonable reader” and explaining that a “statement is not considered false unless it ‘would have a different effect on the mind of the reader from that which the pleaded truth would have produced.’ ”) (quoting R. Sack, Libel, Slander, and Problems 138 (1980)); Keller v. Miami Herald Pub. Co., 778 F.2d 711, 716 (11th Cir.1985) (“Appellant’s strictly literal interpretation ignores the nature of a cartoon and how cartoons are traditionally understood by those who view them: ‘[Such an] interpretation does not construe [the cartoon] as the common mind would understand [it] but is tortured and extreme.’ Valentine v. C.B.S., Inc., 698 F.2d 430, 432 (11th Cir.1983) (per curiam).”).

B. “Scabs” List Was Not False

Applying this precedent, we examine whether the “scabs” list was false. In assessing falsity, we place the “scabs” list in the context of the above undisputed events surrounding the 1989 strike and interpret the “scabs” list from the perspective or understanding of the reasonable reader.
As in Letter Carriers, our initial step is to examine the commonly understood definitions of “scab” and “strike.” The pertinent definition of “scab” for this case is “one who refuses to strike or returns' to work before a strike has ended.”[7] Like *1194 wise, the commonly understood definition of “strike” in a labor context is “a temporary stoppage of work by a body of workers designed to enforce compliance with demands (as changes in wages, hours, or working conditions) made on an employer.” [8] It is undisputed that the 1989 sympathy strike was designed to enforce compliance with such demands.
Thus, under the undisputed facts here, a reasonable reader of ALPA’s list of “The Scabs of Eastern of the Strike of ’89” would interpret it as a list of those pilots who crossed the union’s picket lines and worked during the 1989 work stoppage. Because these pilots admit they crossed picket lines to work during that 1989 work stoppage, ALPA’s listing them as “scabs” was factually true and the district court correctly granted summary judgment on their libel claims for failure to show falsity.[9] No reasonable jury could find otherwise.
The pilots argue that ALPA was never legitimately on strike because it failed to conduct a formal secret ballot of its membership as required by ALPA’s Constitution and By-Laws. Contending the strike was illegally called, the pilots assert that there was no valid strike, that they cannot be considered to have worked when then-union was striking, and thus that they cannot be considered as “scabs.”
The pilots argue that falsity should be assessed in this case based on the technical, legalistic definition of “strike” and whether this “strike” was called legally under ALPA’s Constitution and By-Laws. Their argument, however, misses the whole point of Letter Carriers, Linn, and Bresler’s mandates to consider the surrounding circumstances and reasonable understanding of the supposedly defamatory remarks and not the strictly legalistic or literal interpretation of the words used. It is undisputed that the strike called by ALPA’s leadership resulted in a massive union work stoppage; that there were union picket lines; that as many as ninety percent of Eastern phots refused to fly for Eastern initially; that a strike committee was set up and local communication centers were operating; that Plaintiffs returned to work during that work stoppage; and that the majority of pilots actually supported and voted overwhelmingly to continue ALPA’s leadership’s called work stoppage. Even though the pilots now contend that ALPA’s leadership should have had a full membership vote by secret ballot first, it is undisputed that its union pilots actually struck Eastern and a massive work stoppage occurred. As a reasonable reader would have understood, a “scab” of “Eastern of the Strike of ’89” was a person who returned to work during the well-publicized 1989 pilots’ massive work stoppage designed to enforce compliance with demands made on an employer. The truth or falsity of the label “scab” turns not on a highly formalistic, legal analysis of the validity of the strike itself under ALPA’s constitution but on a reasonable reader’s perception of this work stoppage as a “strike.” Thus, ALPA’s describing Plaintiffs as “scabs” was not false.
Supreme Court precedent explicitly supports this conclusion. In Letter Carriers, addressing a union’s allegation that the plaintiffs were guilty of “treason,” the Supreme Court explicitly explained that the union’s charge was not “false” merely because the plaintiffs were not guilty of “treason” in the technical sense. 418 U.S. at 285-86, 94 S.Ct. 2770. Likewise, in Bresler, the Court explained that an allegation that the plaintiff had committed *1195 “blackmail” should be read in context as a statement that the plaintiffs bargaining position was unreasonable-not an accusation that the plaintiff had actually committed the criminal offense of blackmail. 398 U.S. at 14, 90 S.Ct. 1537.
Similarly, ALPA’s listing of these pilots as “scabs” during the 1989 strike was not an accusation that ALPA’s leadership called the sympathy strike in the strict, legal manner provided for under its Constitution and By-Laws, its Administrative Manual, and its other rules. Instead, placing these pilots on the “scabs” list was an allegation that they worked during the union’s called work stoppage and was factually true. A reasonable reader would understand the phots on ALPA’s “scabs” list to be the pilots who returned to work across union picket lines during the 1989 work stoppage.[10] In assessing falsity of “scabs” in this libel suit, how a labor strike must be called under a particular union’s constitution, by-laws, and rules, and whether this labor strike was legally called thereunder are simply not part of the generally accepted definitions of a “scab” or a “strike” that inform the analysis in a libel claim — much less a part of the reasonable reader’s concern in reading the 1989 “scabs” list.[11]

C. Strike Was Lawfully Called

In any event, the district court correctly held that ALPA’s 1989 sympathy strike was lawfully called. ALPA’s constitution does provide that members “will be balloted” before a “suspension of service” and that the majority vote of the MEC is required before “a strike vote of the members.” [12] This provision is general and does not distinguish between primary strikes and sympathy strikes.
However, ALPA’s constitution also (1) vests its Board of Directors with authority to control and manage the business affairs of ALPA; (2) charges the Board with the authority to interpret and apply the terms of ALPA’s constitution; and (3) provides that in the event of any dispute about the intent or meaning of its constitution, the *1196 Board’s interpretation of the constitution shall govern.[13] ALPA’s Board is also authorized to develop internal ALPA policies, which are contained in its Administrative Manual and are binding on all ALPA members. In particular, a section entitled “Strike Policy” in that Manual gives the MEC authority to declare a sympathy strike:
D. PICKET LINES IN THE EVENT OF A STRIKE SOURCE — Board 1966; AMENDED — Board 1986
1. The decision to honor or not honor picket lines of other crafts shall be left to the discretion of the President and the MEC of the carrier involved.
2. No ALPA member shall cross another ALPA member’s picket line in order to do struck work.
ALPA Administrative Manual, Part 4, Section D (emphasis added).
This Strike Policy has remained essentially unchanged since 1966. The unrebut-ted evidence in this case shows that for the past thirty years ALPA consistently has applied its constitution and this Strike Policy in the same manner as it did during the Eastern ALPA sympathy strike and has called sympathy strikes without a membership vote first.[14] The general language of this ballot provision has been interpreted by ALPA’s Board for thirty years to apply to only primary strikes and not to secondary strikes, also known as sympathy strikes.[15]
*1197 The district court correctly held that ALPA’s longstanding interpretation of its own governing documents is entitled to considerable judicial deference, subject to judicial review only if “patently unreasonable” or adopted in bad faith. See Dow v. United Bhd. of Carpenters and Joiners, 1 F.3d 56, 58 (1st Cir.1993); Local 1052 United Bhd. of Carpenters & Joiners v. Los Angeles County Dist. Council of Carpenters, 944 F.2d 610, 613 (9th Cir.1991); Air Wisconsin Pilots Protection Comm. v. Sanderson, 909 F.2d 213, 218 (7th Cir.1990); Newell v. International Bhd. of Elec. Workers, 789 F.2d 1186, 1189 (5th Cir.1986). Judicial deference is particularly appropriate in this libel case where ALPA’s interpretation is consistent with its well-established past practices for sympathy strikes, where most pilots participated in the leadership’s called strike, where the pilots subsequently voted overwhelmingly in August 1989 to continue the strike, and where ALPA’s constitution provides that the Board’s interpretation shall govern in the event of dispute. The district court correctly deferred to ALPA’s interpretation of its governing documents. Even if ALPA’s interpretation were somehow incorrect, the record contains no evidence that ALPA’s thirty-year interpretation is patently unreasonable or that it was adopted in bad faith.[16]
In sum, we find that the pilots have not shown that ALPA’s sympathy strike was unlawfully called. At a minimum, there is insufficient evidence that ALPA’s interpretation of its constitution is patently unreasonable or adopted in bad faith.

D. No Jury Issue Regarding Actual Malice

Independently of the above reasons, all Defendants are also entitled to summary judgment on the libel claim because the phots have produced insufficient evidence of “actual malice.” Indeed, the evidence establishes that Defendants reasonably believed these pilots were “The Scabs of Eastern of the Strike of ’89” because they undisputedly crossed ongoing picket lines during the sympathy strike. At a minimum, the record is devoid of evidence to support a jury finding that the pilots proved by clear and convincing evidence that Defendants knew — or were reckless 'about whether' — they were “The Scabs of Eastern of the Strike of ’89.” Similarly lacking is any evidence that Defendants knew or were reckless about whether readers would strictly construe the terms “scabs” and “strike” according to technical definitions rather than the common understanding of workers who cross picket lines during a work stoppage.
The inquiry in a case involying actual malice is not whether the defendants acted negligently or imprudently in publishing the challenged statements. See Masson, 501 U.S. at 510, 111 S.Ct. 2419; St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Rather, a defamation plaintiff must establish that a defendant acted with a “high degree of awareness of ... probable falsity” of factual statements or in fact “entertained serious doubts as to the truth of his *1198 publication.” Masson, 501 U.S. at 510, 111 S.Ct. 2419 (citations omitted); St. Amant v. Thompson, 390 U.S. at 731, 88 S.Ct. 1323; Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); accord Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Bose Corp. v. Consumers Union, 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).
This actual-malice standard requires a plaintiff to establish by clear and convincing evidence, Masson, 501 U.S. at 510, 111 S.Ct. 2419; Anderson, 477 U.S. at 254, 106 S.Ct. 2505, that “the defendant realized that his statement was false or that he subjectively entertained serious doubt as to [its] truth.” Bose, 466 U.S. at 511 n. 30, 104 S.Ct. 1949; see Holbrook v. Harman Automotive, Inc., 58 F.3d 222, 226 (6th Cir.1995); Clyburn v. News World Comm. Inc., 903 F.2d 29, 33 (D.C.Cir.1990).[17]
Here, there is no evidence, let alone sufficient evidence to meet the clear and convincing standard, that Defendants subjectively believed the strike was illegally cahed and therefore it would be inaccurate to describe the pilots as “scabs.” First, it is important to note the parties have never suggested that anyone contested the legality of the strike while it was ongoing. Each individual Defendant testified that he considered the phots who crossed ALPA’s picket lines to be “scabs” because they abandoned the ALPA sympathy strike, took the jobs of striking pilots, and sided with Eastern during the strike. These ALPA officials also testified, without contradiction, that they in fact believed that the Eastern MEC and ALPA’s President properly authorized the pilot sympathy strike pursuant to ALPA’s Strike Policy. Given ALPA’s thirty-year-old written policy and consistent practice of initiating sympathy strikes without a formal membership vote, and given that the majority of the pilots actually struck against Eastern, participated in a massive work stoppage, and later voted in favor of continuing the strike, there is no evidence that the ALPA Defendants entertained serious doubts about whether these pilots were accurately described as “scabs.” Therefore, we affirm the district court’s summary judgment order on the libel claim because the pilots failed to show both a false statement and actual malice.

E. Pilots Who Flew for Eastern Only After August 6

The district court also correctly rejected the separate argument made by a group of pilots who crossed the union picket lines only after the union meeting on August 6 (the “post-August 6 crossover pilots”).[18] These pilots contended that they could not be described accurately as “scabs” because even if ALPA’s leadership legally called the sympathy strike on March 3, 1989, MEC Chairman Bavis in *1199 structed them “to return to work” on August 6,1989.
The audiotape of the August 6 meeting shows that Bavis prefaced certain remarks by stating that he was “[sjpeaking just as Jack Bavis, the pilot,” not as “your elected representative! ],” and that Bavis and every other speaker at the August 6 meeting emphasized that the Eastern pilot group had to maintain its unity and abide by the decision of the majority. Such personal opinions in the course of a debate do not remotely constitute official “instructions” to break ranks and cross picket lines to return to work on an individual basis. As the audiotape of the August 6 meeting also shows, Bavis made plain that “I’m not going to go back to work personally, unless we all go back to work in the cockpit.... I’m not gonna go back to work and cross the picket line.” “[Rjegardless of what the outcome is in terms of the decisions we make as a group,” Bavis explained, “we’ve made them as a group coming out, we make them as a group going back.”
Despite the existence of this audiotape, a jury issue still exists about what Bavis actually said at the August 6 meeting because the audiotape was not an official recording of the meeting and seventeen pilots filed affidavits stating that Bavis urged pilots to return to work at the August 6 meeting.[19]
However, even though a jury issue exists about what Bavis actually said on August 6, there is no question of fact about what actually happened after that August 6 pilot meeting. It is undisputed that from then until November 22, 1989, the work stoppage continued, Eastern pilots in uniform continued to walk picket lines, the sympathy strike continued, and the pilots continued to cross picket lines and to work. Indeed, it is not disputed that throughout the rest of August 1989, ALPA, the Eastern MEC, and the Eastern MEC’s strike operations committee repeatedly instructed all pilots to remain on strike. Between August 6 and August 9, the Eastern MEC and the overwhelming majority of the pilot group also voted to continue the strike. ALPA and the Eastern MEC notified every Eastern pilot of this decision. ALPA President Duffy notified all ALPA pilots by letter of the MEC’s decision. As Duffy explained:
Over the past week ... the Eastern pilots have reviewed their options and have voted overwhelmingly not to return to work without a structured settlement of the sympathy strike.
On August 12, 1989, the strike operations committee likewise confirmed that “THE STRIKE IS ON!! THE PICKET LINE REMAINS!!” The record contains evidence of how the pilots’ overwhelming vote to remain on strike was widely reported in the media and in ihternal ALPA communications.
Accordingly, by August 12, 1989, both the Eastern MEC and the overwhelming majority of Eastern pilots had voted to continue the pilots’ sympathy strike. Both the Eastern MEC and ALPA notified all Eastern pilots that ALPA and the MEC had considered and rejected the option of terminating the strike. From August 12, 1989, until the end of the sympathy strike in November 1989, the Eastern MEC continued to direct all pilots to maintain the picket lines, and, more importantly, Eastern pilots continued to walk the picket lines in their Eastern uniforms.
As outlined above, the test is not what these post-August 6 crossover pilots thought but what Defendants subjectively knew. The test is not whether these pilots thought they were instructed to return to work and whether they thought the strike was over, but whether Defendants included the post-August 6 crossover Plaintiffs on the “scabs” list knowing the strike had *1200 ended on August 6. These pilots cannot show the Defendants knew the strike had been terminated because it is undisputed that after August 6, the work stoppage continued and Eastern pilots picketed until November 22, 1989. More importantly, even if these pilots took Bavis’s remarks to be official instructions from ALPA to return to work, their subjective impression that they had ALPA’s consent to cross pilot picket lines does not establish actual malice. It is Defendants’ subjective view, not the phots’, that determines whether the “scabs” list issued with actual malice.
We also disagree that actual malice is shown because ALPA knew that many pilots returned to work after August 6 and that ALPA’s failure to consider the practical effect of Bavis’s statements on these pilots may constitute reckless disregard of the truth. Bavis’s statements did not occur in a vacuum but as part of a series of ongoing events. Shortly after the August 6 meeting, the vast majority of pilots voted to continue the strike, and on August 12, the union unequivocally announced, “THE STRIKE IS ON!!” Thus, any practical effect of Bavis’s statements lasted only until August 12. These particular pilots continued to work after August 12 through the end of the strike in November, and no reasonable jury could find the strike still appeared to be over after August 12-much less that Defendants were reckless about such appearance.
Thus, the post-August 6 crossover pilots have failed to present any evidence from which a reasonable juror could conclude that the ALPA Defendants believed it was false to refer to them as “scabs.” At a minimum, there is insufficient evidence to establish actual ■ malice by clear and convincing evidence.
V. APPELLANT NORMAN
Appellant Joseph S. Norman, II, advances pro se an additional argument that ALPA acted with malice as to him.[20] According to Norman, he crossed the picket lines to participate in Eastern’s pilot training program, not to work as a pilot. Consequently, Norman argues that he never “worked” in violation of the strike and thus was not a scab. He cites a case holding that trainee pilots are not “permanent employees” for purposes of the Railway Labor Act. See Eastern Air Lines, Inc. v. Air Line Pilots Ass’n Int’l, 920 F.2d 722, 727 (11th Cir.1990).
Norman’s contentions lack merit. The record shows that Norman was hired by Eastern as a DC-9 Captain and received compensation while in training. One of his job requirements was to participate in the pilot training program. Under these circumstances, Norman was “working” for Eastern in the ordinary sense of the term. It is this colloquial use of “working” — and not Norman’s legal classification under the Railway Labor Act — that is relevant in determining whether “scab” can be applied to him. Consequently, ALPA had no additional reason to know that Norman was not a scab; his situation is therefore no different from that of all the other pilots [21] who worked despite the strike.[22]
VI. CONCLUSION
For these reasons, we affirm the district court’s grant of summary judgment in fa *1201 vor of all Defendants on all Plaintiffs’ libel claims and affirm the dismissal of Plaintiffs’ claim for intentional interference with their business relationships.
AFFIRMED.

. The Plaintiffs-Appellants also sued certain individual executives in ALPA and in the Eastern MEC. In this opinion, we refer to all of the Defendants-Appellees jointly as "ALPA” or the "Defendants.”

. The Plaintiffs-Appellants filed suit in Florida circuit court; ALPA removed the case to the United States District Court for the Southern District of Florida on the ground that certain of the pilots' claims (not at issue here) were governed by the federal Railway Labor Act. See 28 U.S.C. § 1441 (1994).

. The parties agree that Florida law controls this dispute except to the extent it is preempted by federal law.

. There was a summary judgment motion filed by ALPA and Defendants Duffy and Bab-bit on April 12, 1996, and a separate summary judgment motion filed by Defendants Copeland, Breen, Baldwin, and Petachenko on April 22, 1996, which incorporated the first by reference. The two motions raise nearly identical issues.

. The pilots filed three different complaints in this suit; each complaint modified the prior complaint. The interference with business relationships claim was part of the pilots’ second complaint. ALPA contends that the pilots waived their right to appeal the dismissal because after dismissal of that claim they failed to replead interference with business relationships in their third (and final) complaint. We disagree. The pilots presumably had nothing to add to their interference with business relationships claim; consequently, repleading would have been futile and would have resulted only in a second dismissal under Rule 12(b)(6). For this reason, we do not require a party to replead a claim following a dismissal under Rule 12(b)(6) to preserve objections to the dismissal on appeal. See Wilson v. First Houston Inv. Corp., 566 F.2d 1235, 1237-38 (5th Cir.1978), vacated on other grounds, 444 U.S. 959, 100 S.Ct. 442, 62 L.Ed.2d 371 (1979).

. As noted by the dissent, the piece of trade union literature, entitled "Ode To A Scab," was on the front cover of the scab list in this case entitled "The Scabs of Eastern of the Strike of ’89.” Although the Supreme Court in Letter Carriers held the epithet "scab” is a factual allegation that will support a libel claim if false and made with actual malice, the Court clarified that the pejorative definition of what a "scab” is in Jack London’s "Ode To A Scab” was "rhetorical hyperbole” and was entitled to protection under the federal labor laws. 418 U.S. at 285-86, 94 S.Ct. 2770. The Court explained ”[b]efore the lest of reckless or knowing falsity can be met, there must be a false statement of fact....” Id. at 284, 94 S.Ct. 2770. However, according to the Court, the rhetoric in "Ode To A Scab” was “obviously used here in a loose, figurative sense to demonstrate the union’s strong disagreement with the views of the workers who oppose unionization” and was not a representation of fact. Id. The Court further noted that Jack London’s definition of a scab "has become a familiar piece of trade union literature; according to undisputed testimony in this case it has been published countless times in union publications over the *1193 last 30 years or more.” Id. at 286, 94 S.Ct. 2770.

. The various definitions of a "scab” in the labor context are: "(1): one who refuses to join a union (2): a member of a union who refuses to strike or returns to work before a strike has ended (3): a worker who accepts employment or replaces a union worker during a strike (4): one who works for lower wages than or under conditions contrary to those prescribed by a union.” Webster's Third New International Dictionary 2022 (1986). The definitions quoted are from the 1986 version of the dictionary, which was the current version when the "scabs” list was published in 1991. The definitions remain unchanged in the 1993 version of the same dictionary. See Webster's Third New International Dictionary 2022 (1993).

. Webster's Third New International Dictionary 2262 (1986).

. The district court ruled that "the listing of the Plaintiffs on the scab list either is not a matter of fact, or is indeed factually correct. By common parlance, a 'scab' is 'one who works for less than union wages or on nonunion terms.' ” 836 F.Supp. 1575, 1581 (S.D.Fla.1993) (citing Webster’s New Collegiate Dictionary 1021 (1979)). Because all Plaintiffs crossed picket lines, the district court further held that all Plaintiffs "crossing a picket line during a sympathy strike constitutes working on nonunion terms.” Id.

. It strains credulity, as suggested by the dissent, that in the face of the massive work stoppage of 1989, the picketing, the polls of the pilots in favor of the strike, and the communications from ALPA about the ongoing nature of the strike that a reasonable reader would infer the suggestion of a strike called in strict conformance with ALPA’s constitution simply because it was a union that used the term "scab.” Additionally, there is no evidence in this record that any ALPA member during the course of the 1989 strike sought an injunction to halt the strike as illegally called under ALPA’s constitution, but instead ALPA’s pilots overwhelmingly voted to support the strike and actually struck Eastern.

. We found no published case applying Letter Carriers where defamation liability was imposed based on a "scab” allegation during an admitted labor dispute — much less on the dissent’s novel theory that even though a strike occurred, the lack of a validly called strike renders a "scab” allegation false as a matter of law. The truth of the "scabs” list depends not on the legal validity of the strike but upon the reader’s perception of the existence of a labor dispute, such as a strike, and of whether Plaintiffs-Appellants opposed the union during the labor dispute, such as by returning to work across union picket lines. As quoted above, the commonly understood definition of a strike is not a legalistic definition but is "a temporary work stoppage by a body of workers designed to enforce compliance with demands ... made on an employer.” See footnote 7 infra.

.ALPA’s Constitution provides in Article I:
SECTION 25 — SUSPENSION OF SERVICE
When a suspension or withdrawal of service is called for in compliance with the requirements of the Constitution and ByLaws or the Policy Manual, the members will be balloted before such action may be taken. Association general balloting procedures will be used.
Article IV, Section 2(B), provides:
SECTION 2 — JURISDICTION AND DUTIES OF MASTER EXECUTIVE COUNCIL
B. The approval by a majority vote of the Master Executive Council on an airline with the advice of the President [of ALPA] is mandatory before a strike vote of the members of an airline may be taken. This membership strike vote shall be by secret ballot.... A simple majority of valid ballots returned shall govern.

. Article VII, Section 2, provides:
SECTION 2 — JURISDICTION AND DUTIES
The Board of Directors is the highest governing body of the Association. It shall be vested with the control of the Association, its general management and business affairs. Its decision, whether rendered by ballot or in session, shall be the final governing decision of the Association and shall be binding on the Executive Board, the Executive Committee, the Officers, and all members of the Association, subject to action of the Executive Board pursuant to Article V, Section 2, of this Constitution and By-Laws. The Secretary of the Association shall ballot the Board of Directors on any issue when petitioned by fifteen percent (15%) of the Board of Directors. In the event of any dispute arising out of the meaning or intent of these Constitution and By-Laws, the Board of Directors shall have the power to interpret the Constitution and By-Laws and such interpretation shall govern the Association in the conduct of its business and affairs.

. As Seth Rosen, ALPA's long-time Director of Representation, stated:
In my employment with ALPA over the last 25 years, I have been involved in or had close personal knowledge of a number of occasions on which ALPA decided to engage in sympathy strikes. In particular, I have personal knowledge of the following occasions on which ALPA decided to engage in sympathy strikes:

Year Air Carrier Primary Strike By

1971-72 Hughes Air Corp. d/b/a Air West Aircraft Mechanics Fraternal Ass’n
1973 Ozark Air Lines Aircraft Mechanics Fraternal Ass'n
1974 Saturn Airways Int’l Bhd. of Teamsters
1977 Trans Int’l Airlines Int’l Bhd. of Teamsters
1979 Ozark Air Lines Ass’n of Flight Attendants
1985 Pan American World Airways Transport Workers Union
To the best of my knowledge, on none of the above listed occasions was a vote of ALPA members taken for the purpose of authorizing the decision to engage in a sympathy strike. Indeed, I am not aware of any occasion on which a vote of ALPA members was conducted for the purpose of authorizing a sympathy strike.
(emphasis added). In contrast, Mr. Rosen stated that ALPA’s general practice has been to ballot members only prior to conducting a primary strike.

. J. Randolph Babbitt, the current president of ALPA, testified at his deposition:
It is our practice here for a primary strike to follow the procedures set forth in the Constitution and Bylaws. It is equally our practice, if there is a secondary strike, there is specific language that directs us in the Policy Manual to a different set of procedures and we would follow those.
John Bavis, who had twenty-four years of experience at ALPA and is a former chairman of the Eastern MEC, similarly testified at his deposition:
If what you are asking me is did we actually do a strike vote of the membership under paragraph B, my answer to you is no. However, the authority and duty to [sic] the MEC is contained in all of this section. And B talks about a primary strike, which could be the pilots' own strike on the property. It is silent here in this particular section you're talking about dealing with *1197 the question about a secondary strike. You have to go to the Administrative Manual to find out what the process is to follow. And when you do that, it says in words to the effect that the president in conjunction with the MEC is the decision-making factor to honor another craft’s picket line on your property. It takes both of those constituent bodies to agree.
The literal words say strike vote of the members of airlines may be taken. It refers to a primary strike on the property. Even though the word primary isn’t there, that is the intent of the particular paragraph.

. The dissent describes ALPA’s interpretation as "simply ridiculous” and "implausible.” There are common sense arguments why union members would want a membership vote for all types of strike. However, the question here is not what we think is best or what pilots likely would insist upon before a sympathy strike is called. Instead, the question is what actually happened in this case and whether this Court should defer to ALPA’s interpretation of its own constitution under the specific uncontested facts in this record.

. Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with "actual malice.” See Masson, 501 U.S. at 510, 111 S.Ct. 2419 (“Actual malice .. . should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.”); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (same).

. Plaintiffs divide themselves into three groups by dates. Plaintiffs in Group III never honored the ALPA picket lines and worked throughout the strike. Plaintiffs in Group II crossed ALPA's picket lines between March 4, 1989, and August 6, 1989. Groups II and III allege only that they were defamed by being placed on the "scabs” list because no membership strike vote was taken, rendering ALPA’s sympathy strike invalid and illegal.
In contrast, Plaintiffs in Group I crossed ALPA's picket lines only after the Miami-based pilots' meeting on August 6, 1989. The Group I Plaintiffs allege that they did not cross IAM’s picket lines until told to return to work on August 6 by officers of Defendant ALPA and the Chairman of the Eastern MEC. Thus, even if the sympathy strike was validly called initially, the Group I Plaintiffs make the additional argument that the union leadership acted with actual malice toward them by calling them "scabs” after telling them to return to work on August 6, 1989.

. The dissent points to an ALPA newsletter and charges preferred against Bavis as evidence of what was said at the August 6 meeting. However, the newsletter and the charges were not contemporaneous with any confusion about the strike that may have occurred in the meeting on August 6, 1989. Instead, the newsletter was published in 1992, and the charges were in December 1989-both well after the official conclusion of the strike on November 22, 1989.

.Norman also contends that he was not served with ALPA's motion for summary judgment at least ten days before the hearing thereon, as required by Fed.R.Civ.P. 56(c). See United States v. One Colt Python .357 Cal. Revolver, 845 F.2d 287, 289 (11th Cir.1988). The record, however, establishes that the required notice was served upon Norman’s counsel nine months prior to the hearing. The fact that Norman subsequently began proceeding pro se — after service upon his counsel but prior to the district court's ruling on the motion — does not invalidate the notice served while he was represented by counsel and thus does not necessitate a second service.

. Norman began working for Eastern in May 1989, and thus is not among the pilots who returned to work after August 6, 1989.

. In light of this conclusion, we can also conclude that the district court did not abuse its discretion in denying Norman’s motion for severance.